# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**XAVIER TORRES,**                           )
                                             )
       **Plaintiff,**          )
                                             )
v.                                           )
                                             )   Case No. _____
                                             )
**STEWART COUNTY SCHOOL**                    )   **JURY DEMAND**
**SYSTEM, DR. BENJAMIN DUNCAN,**             )
**TAMMY GRAY, BRYAN SAUNDERS,**              )
**DONNA GILLUM, MARIAN PAGE, and**           )
**TRACY WATSON,**                            )
                                             )
      **Defendants.**         )

## COMPLAINT

Plaintiff, Xavier Torres, through his undersigned attorneys, states as follows:

## INTRODUCTION

1.    This cause of action stems from Defendants' mishandling of false sexual harassment allegations against Plaintiff Xavier Torres that not only violated his constitutional right to due process, but also ruined his reputation in the community. The Complaint asserts causes of action for violations of Plaintiffs' 14th Amendment right to due process, violation of § 504 of the Rehabilitation Act, and negligence.

## PARTIES

2.    Plaintiff Xavier Torres is resident of Stewart County, Tennessee, and a former student of Stewart County High School (the "School"), which is located in Stewart County, Tennessee.

1

3. Defendant Stewart County School System ("SCSS") is a public school system duly authorized by the laws of the State of Tennessee.

4. Defendant Dr. Benjamin Duncan is a resident of Stewart County, Tennessee, and was Principal of the School at all times relevant to this Complaint. Defendant Duncan is being sued in his individual capacity.

5. Defendant Tammy Gray is a resident of Stewart County, Tennessee, and was Assistant Principal of the School at all times relevant to this Complaint. Defendant Gray is being sued in her individual capacity.

6. Defendant Bryan Saunders is a resident of Stewart County, Tennessee, and sat on the SCSS Disciplinary Hearing Committee at all times relevant to this Complaint. Defendant Saunders is being sued in his individual capacity.

7. Defendant Donna Gillum is a resident of Stewart County, Tennessee, and sat on the SCSS Disciplinary Hearing Committee at all times relevant to this Complaint. Defendant Gillum is being sued in her individual capacity.

8. Defendant Marian Page is a resident of Stewart County, Tennessee, and sat on the SCSS Disciplinary Hearing Committee at all times relevant to this Complaint. Defendant Page is being sued in her individual capacity.

9. Defendant Tracy Watson is a resident of Stewart County, Tennessee, and was the SCSS Title IX Coordinator at all times relevant to this Complaint. Defendant Watson is being sued in her individual capacity.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over the instant matter pursuant to 28 U.S.C. § 1331, as this case contains claims brought under the United States Constitution and

2

federal statutes. Additionally, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims because they are so related to his federal claims that they form part of the same case or controversy.

11.     Venue in the Middle District of Tennessee is proper under 28 U.S.C. § 139l(b) because a substantial portion of the events or omissions giving rise to the claims occurred within the Middle District of Tennessee.

## JURY DEMAND

12.     Plaintiff requests a jury trial on the issues and claims set forth in this Complaint.

## FACTUAL ALLEGATIONS

### A.  Plaintiff and His Disabilities.

13.     Plaintiff was a student at Stewart County High School from August 2017 until May 2021, when he graduated. Plaintiff was a Senior during the events described in this Complaint.

14.     Plaintiff has struggled with attention deficit hyperactivity disorder, pervasive developmental disorder, and mood disorder since he was a child.

15.     To address these health issues during his tenure at the School, Plaintiff took medication, sometimes dispensed by SCSS, and visited a Centerstone therapist on School grounds at least once per week.

16.     Plaintiff's disabilities qualify him for accommodations under the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), and the Individuals with Disabilities in Education Act ("IDEA").

17.     Although most of SCSS's records concerning Plaintiff's disabilities are inexplicably missing from Plaintiff's SCSS file, SCSS had notice of Plaintiff's disabilities.

3

18.     What remains of Plaintiff's SCSS file does contain information on Plaintiff's diagnoses of attention deficit hyperactivity disorder, pervasive developmental disorder, and mood disorder.

19.     Additionally, Plaintiff had to be excused from class to visit the Centerstone therapist, and SCSS personnel previously dispensed medication to Plaintiff when he was in middle school. These actions would be impossible if SCSS did not have knowledge of Plaintiff's disabilities.

20.     Despite his disabilities, and thanks in part to his treatment, Plaintiff was able to succeed academically in classes with the general student population.

21.     Indeed, Plaintiff was accepted into Austin Peay State University ("APSU") in the spring of 2021, but could not ultimately attend due to the events described in this Complaint.

**B.   The December 2, 2020 Sexual Harassment Complaint Against Plaintiff and Initial Investigation.**

22.     Plaintiff's disabilities did sometimes cause disciplinary issues in class, but he had never been accused of sexual harassment prior to December 2, 2020.

23.     On December 2, 2020, Plaintiff was accused of sexual harassment by a female classmate in his Nutrition class. The classmate alleged that Plaintiff touched her inner thigh inappropriately during class.

24.     Defendant Gray conducted an initial investigation of the accusation that same day. Her investigation consisted of interviewing the female student and then interviewing Plaintiff.

25.     SCSS is a public education system that receives federal funding. Therefore, it is subject to the requirements of Title IX of the Education Amendments of 1972 ("Title IX").

4

26.     Sometime after conducting the interviews with the accusing student and Plaintiff, Defendant Gray apparently called Defendant Watson, and confirmed with Defendant Watson that the female student's accusation constituted a formal sexual harassment complaint under Title IX.

### C. Title IX's Requirements for Sexual Harassment Complaint Grievance Processes.

27.     Because the accusation against Plaintiff constituted a formal sexual harassment complaint under Title IX, School administrators were required to follow the Title IX investigation and discipline procedures promulgated by the United States Department of Education in a Final Rule that went into effect on August 14, 2020 (the "Final Rule").

28.     The Final Rule codified the definition of sexual harassment in the educational context and prescribed grievance process procedures designed to both protect complainants and safeguard the due process rights of those accused of sexual harassment.

29.     The Final Rule mandates that schools follow a grievance process to address a sexual harassment complaint that complies with its requirements before imposing disciplinary sanctions against any student accused of sexual harassment. *See* 34 C.F.R. § 106.44(a).

30.     A school must provide the complainant with "supportive measures" while the grievance process is pending, which may include moving the accused student out of the complainant's class, so long as those supportive measures are not unreasonably burdensome on the accused student. *See* 34 C.F.R. §§ 106.30(a), 106.44(a).

31.     The grievance process must, among other things, presume that the accused is not responsible for the alleged conduct until it has been proven at the conclusion of the grievance process, and must be conducted by school employees who are trained in the Final Rule's requirements. *See* 34 C.F.R. § 106.45(b)(1)(iii), (iv).

32.     The standard of proof for the grievance process may be either preponderance of the evidence or clear and convincing evidence, as long as the same standard is applied to all formal complaints of sexual harassment. *See* 34 C.F.R. § 106.45(b)(1)(vii).

33.     If a school initiates a grievance process, it must give written notice of the formal sexual harassment complaint to the accused student and give the accused sufficient time to respond to the complaint before the school conducts any initial interview. *See* 34 C.F.R. § 106.45(b)(2)(i)(B). The written notice must also provide the accused student with the identities of any parties involved in the alleged incident, and give the accused student notice of their right to have an advisor, who may be an attorney, inspect and review evidence gathered during investigation of the complaint. *See id.*

34.     The investigation must provide, among other things, equal opportunity for the parties to present witnesses and evidence, provide both the complainant and the accused student the opportunity to review and inspect all evidence gathered during the investigation, and allow a party's advisor, who may be an attorney, to be present during the entirety of the grievance process, including during interviews. *See* 34 C.F.R. § 106.45(b)(5)(ii), (iv), (vi).

35.     After obtaining and reviewing all relevant evidence, the school's investigator must then prepare an investigative report summarizing the relevant evidence, and provide that report to the parties at least ten days prior to any hearing held during the grievance process. *See* 34 C.F.R. § 106.45(b)(5)(vii).

36.     According to the Final Rule, before reaching a determination regarding the accused student's responsibility, K-12 schools may provide the accused student with a live hearing in which the student may offer evidence and cross-examine the witnesses against the student, but it is not required to do so. *See* 34 C.F.R. § 106.45(b)(6)(ii). If the K-12 school does not provide the accused

student the opportunity for a live hearing, it must at least allow the parties the opportunity to pose written questions to the other party and their witnesses, provide each party the answers to those questions, and allow for limited follow-up. *See id.*

37.     Only after following all of the prescribed investigation procedures, and after providing for a hearing or written questions, may a school make a determination regarding responsibility. *See* 34 C.F.R. § 106.45(b)(7). The determination must be in writing, specifically identify the allegations at issue, summarize the procedural steps the school has taken previously, make written findings of fact and conclusions regarding the application of the school's code of conduct to the facts, provide the rationale for the school's decision, and provide both parties with notice of their right to appeal an adverse decision. *See id.*

38.     Additionally, the Final Rule makes clear that a school must keep confidential the identity of both the complainant and the accused student, with very limited exceptions. 34 C.F.R. § 106.71(a).

39.     SCSS passed a grievance process policy that implements the requirements of the Final Rule, but each of the individual Defendants were completely unaware of its requirements.

**D.  The School Decides to Discipline Plaintiff After a Non-Compliant Investigation.**

40.     The School did not provide Plaintiff with any of the due process safeguards outlined by the Final Rule while investigating the allegation against Plaintiff.

41.     Defendant Gray is not trained in the requirements of Title IX, yet she conducted the initial interviews of Plaintiff and his accuser on December 2, 2020. Indeed, the School's Title IX Coordinator, Defendant Watson, did not initially participate in the investigation of the allegation against Plaintiff.

42. Plaintiff was never provided a written notice of the complaint against him before being interviewed by Defendant Gray, nor was Plaintiff informed of his right to have an advisor present during the investigation process.

43. Neither Plaintiff nor his mother, Heather Duarte, were provided with the opportunity to review and inspect all of the evidence gathered by Defendant Gray at any point during her investigation.

44. Then, on December 8, 2020, Defendant Gray notified Plaintiff's mother via a written Notice of ALC Placement (the "Notice") that Plaintiff would be removed from school and sent to the SCSS Alternative Learning Center ("ALC") for the remainder of the school year. A copy of the Notice is attached to this Complaint as Exhibit A.

45. Placement in ALC is considered a suspension from regular high school according to SCSS policies.

46. The only description provided as the reason for this decision was one sentence – "Inappropriately touching a female student."

47. Defendant Gray sent the Notice without issuing an investigative report, conducting a hearing, providing the opportunity for Plaintiff to submit written questions to the complainant and witnesses, or making a determination regarding responsibility that complied with the requirements of the Final Rule.

48. Additionally, despite the fact that Plaintiff has multiple qualifying disabilities under the Rehabilitation Act, the School never conducted the required "manifestation determination" to determine whether any of Plaintiff's disabilities were the cause of the conduct for which he was being disciplined prior to being sent to ALC.

49. After being notified of Plaintiff's placement in ALC, Plaintiff's mother chose to keep Plaintiff at home rather than send him to ALC.

**E. SCSS's Non-Compliant Hearing Affirms Plaintiff's ALC Placement.**

50. The Notice provided Plaintiff notice of his right to appeal his ALC placement pursuant to Tenn. Code Ann. § 49-6-3401, which Plaintiff timely exercised.

51. On December 11, 2020, the SCSS Disciplinary Hearing Authority ("DHA") held a hearing before a three-person committee (the "Committee") concerning Plaintiff's appeal of his placement in ALC. Defendant Page chaired the Committee, and Defendants Saunders and Gillum were the other Committee members. A copy of the hearing's transcript is attached to this Complaint as Exhibit B.

52. Neither the School nor the Committee advised Plaintiff of his right to have an advisor, who may be an attorney, present at the hearing.

53. The only evidence that the School provided to Plaintiff was a redacted copy of the complainant's statement to Defendant Gray. This statement was not provided to Plaintiff at least ten days before the hearing. In fact, the statement was only provided to Plaintiff and his mother *after* the DHA hearing.

54. Defendant Gray presented the School's case. Plaintiff and Plaintiff's mother were in attendance to present Plaintiff's case.

55. During the hearing, Defendant Gray stated that the School had decided to place Plaintiff in ALC because Plaintiff had allegedly been disciplined previously for touching other female students and because the complainant apparently told Plaintiff to stop touching her.

56. Neither Plaintiff nor his mother were provided with evidence of Plaintiff's alleged prior conduct before the hearing.

57.     Defendant Gray did not call the complainant as a witness, or call any witnesses for that matter.

58.     Defendant Gray presented the entirety of the School's case via hearsay.

59.     Plaintiff was not even provided with the opportunity to present his side of the story in an unfettered manner. Instead, Plaintiff was only allowed to testify in response to questions posed by the Committee or statements made by Defendant Gray.

60.     At the conclusion of the hearing, the Committee affirmed the School's decision to place Plaintiff in ALC. It did not issue a written determination of its findings or reasoning behind its decision. Plaintiff was advised of his right to appeal the decision to the Stewart County Board of Education.

## F.  **A Second Investigation Exonerates Plaintiff of Sexual Harassment, but the School Sanctions Him Anyway.**

61.     After the December 11, 2020 hearing, on December 14, 2020, Plaintiff's mother contacted the SCSS Defendant Watson, to discuss the allegations against Plaintiff.

62.     Defendant Watson professed that she did not know about the allegation against Plaintiff, despite the fact that Defendant Gray stated at the December 11 hearing that she had spoken to Defendant Watson about the allegation.

63.      On information and belief, Defendant Watson informed the School that their grievance process for addressing the sexual harassment complaint against Plaintiff was entirely inadequate, for within hours of the conversation between Plaintiff's mother and Defendant Watson, Plaintiff's mother was informed that Plaintiff could come back to school and was no longer on ALC placement.

64.     Defendant Watson then began a second investigation into the allegations against Plaintiff.

65.     On the morning of December 15, 2020, Plaintiff boarded his usual school bus to return to the School after his placement in ALC. When Plaintiff attempted to make his way toward the back of the bus, he was loudly admonished by the bus's aide, SCSS employee Carol Williams, who shouted that because of the pending sexual harassment complaint against him, Plaintiff must sit in the front of the bus where she could see him.

66.     There is no reason why Ms. Williams, who was not a participant or witness in the Title IX investigation into the allegation against Plaintiff, should have known about the sexual harassment complaint against Plaintiff, based on aforementioned Title IX sexual harassment investigation rules intended to protect the rights of accuser and accused.

67.     Additionally, even if there were a permissible reason for the School to have disclosed Plaintiff's status as a respondent in a Title IX investigation to Ms. Williams, it was entirely improper and antithetical to the purpose of the Title IX rules for Ms. Williams to humiliate Plaintiff by loudly disclosing this fact to an entire bus full of Plaintiff's peers.

68.     Then, when Plaintiff arrived at the School that day, Plaintiff was informed that he was being moved from his Nutrition class with the complainant and placed in a different class, World History, during the pendency of Defendant Watson's second investigation into the allegation against him.

69.     The decision to move Plaintiff from his Nutrition class was made on Defendant Watson's recommendation

70.     Defendants Duncan and Gray signed off on the decision to move Plaintiff from his Nutrition class to World History.

71.     The School and Defendant Watson described the move of Plaintiff out of his Nutrition class as a "supportive measure" to keep him separate from the complainant during the pendency of the investigation.

72.     The Final Rule allows such supportive measures, so long as they do not constitute an unreasonable burden upon the accused student.

73.     Plaintiff continued to attend World History while Defendant Watson investigated the allegation against him.

74.     Defendant Watson's investigation consisted of re-interviewing Plaintiff, the complainant, and all of the students in the classroom on the day of the alleged incident.

75.     On January 3, 2021, Defendant Watson issued her written investigation report containing her investigatory findings of fact. A copy of the report is attached to this Complaint as Exhibit C.

76.     In her report, she found multiple inconsistencies in the complainant's account of the allegation against Plaintiff. She also found that Plaintiff and the complainant were both voluntarily playing a game in which they moved their hands up each other's thighs, and that no witnesses viewed the alleged inappropriate conduct, but rather saw Plaintiff and the complainant "talking and laughing with one another."

77.     Defendant Watson therefore concluded that Plaintiff did not sexually harass the complainant.

78.     However, Defendant Watson did conclude that the behavior of Plaintiff and the complainant constituted "conduct unbecoming of a student", and recommended appropriate discipline based on that finding.

79. On January 4, 2021, Defendant Watson emailed a copy of the investigation report to Plaintiff's mother.

80. In the ensuing email exchange, Defendant Watson admitted that the initial investigation into the allegation against Plaintiff was insufficient and in violation of Title IX. Specifically, she stated that, "if I read the procedure correctly, I should have stepped in prior to [Plaintiff's disciplinary hearing]." She went on to describe the School's deficient investigation timeline, and stated that the School made a disciplinary decision, ALC, prior to the conclusion of the investigatory process. She then again stated that, "At this point I should have stepped in to give each party an opportunity to submit a statement in response rather than go to the [Disciplinary Hearing Authority]." A copy of this email is attached to this Complaint as Exhibit D.

81. In this email exchange, Defendant Watson also informed Plaintiff's mother that she was recommending that Plaintiff be given one to two days of in-school suspension ("ISS") due to his "conduct unbecoming of a student."

82. Defendant Watson's ISS recommendation is the only punishment that was recommended as a result of the allegation against Plaintiff.

83. Defendant Watson also opined that "[b]ecause Xavier did not go to ALC,[1] I would not think his rights had been violated."

84. However, despite the fact that the School moved Plaintiff out of his Nutrition class solely as a temporary supportive measure during the pendency of the Title IX investigation, and

---

[1] Defendant Watson's assertion that Plaintiff was not placed in ALC is wholly incorrect. The School placed Plaintiff in ALC, effective immediately, on December 8, 2021. The only reason why Plaintiff did not go to the ALC building is because Plaintiff's mother kept him home rather than send him to ALC.

despite the fact that the investigation exonerated Plaintiff, the School did not return Plaintiff to his Nutrition class.

85.     Instead, the School kept Plaintiff in World History for the remainder of the school year.

86.     The School then proceeded to fail Plaintiff in his Nutrition class, despite the fact that he had solely been removed from the class as a "supportive measure" regarding an investigation in which he had been cleared of wrongdoing.

87.     Defendants Watson, Duncan, and Gray approved of the decision to keep Plaintiff in World History and to give Plaintiff a failing grade in Nutrition.

88.     Additionally, even though Plaintiff was only in his Nutrition class for less than half of the school year, the School based his failing grade on a full year, one-credit class.

89.     Plaintiff thus received a "zero" for a one-credit course on his final transcript.

90.     This zero dropped Plaintiff's unweighted GPA below a 3.0 and rendered him ineligible for numerous scholarships at APSU.

91.     The School's decision to issue Plaintiff a failing grade in a class as a result of the sexual harassment complaint against him obviously constitutes a disciplinary sanction as defined by the Final Rule.

92.     The School imposed this disciplinary sanction upon Plaintiff despite the fact that the Title IX investigation exonerated him, in clear violation of the Final Rule and the United States Constitution's guarantees of due process.

93.     The School also imposed this disciplinary sanction upon Plaintiff, which constituted a major change in placement, without making a "manifestation determination", despite the fact that Plaintiff has a qualifying disabilities under the Rehabilitation Act.

14

94.     There are a number of ways that the School could have addressed Plaintiff's removal from the Nutrition class that would have been less detrimental, or more appropriately non-detrimental, to Plaintiff including, but not limited to, returning Plaintiff to his selected, preferred curriculum of attending the Nutrition class, or simply removing the Nutrition class from Plaintiff's transcript.

G. **The School's Failure to the Keep the Title IX Investigation Confidential Makes Everything Worse.**

95.     In addition to their failure to adhere to the due process safeguards required by law when investigating the allegation against Plaintiff and meting out concomitant punishment, the School and its administrators failed in their duty to keep the details of the investigation confidential.

96.     The most glaring example of this failure to keep information confidential is the outburst by the bus aide, Carol Williams, on December 15, 2020, as described in Paragraph 65 of this Complaint.

97.     The School also did not instruct the complainant to keep the investigation confidential.

98.     As a result of the School's failure to keep the investigation confidential, rumors began spreading among students and the community at large that Plaintiff was a sexual predator.

99.     In early January, Plaintiff's mother informed SCSS Director Michael Craig and Defendant Watson about the rumors being spread about Plaintiff, and asked them to act to stop them.

100.     Director Craig and Defendant Watson did not act. As a result, the rumors persisted and sometimes escalated.

101.    In one instance, on March 12, 2021, two students filed a false harassment complaint with the School against Plaintiff. The complaint alleged that Plaintiff harassed them during class and lunch.

102.    The School's administrators compared the schedules of the two students with that of Plaintiff, and quickly determined that the allegations were false, as the students did not share a single class with Plaintiff.

103.    Despite the fact that the students leveled obviously false allegations against Plaintiff, School officials declined to take further action to stop the rumors and ameliorate the bullying that Plaintiff was facing.

104.    In another instance, a new friend of Plaintiff's informed him that they could no longer be friends because she was scared he was a rapist.

105.    Adults in the community are also aware of the allegations against Plaintiff, and have discussed them with Plaintiff's mother and others in the community.

**H. Plaintiff Has Suffered Tremendously as a Result of this Ordeal.**

106.    The months-long ordeal that Plaintiff endured as a result of the School's deficient handling of the allegations against him has caused a significant strain on Plaintiff's already-fragile mental health.

107.    In March 2021, Plaintiff was diagnosed with major depressive disorder, which directly stemmed from the allegations against him and the rumors being spread that he was a rapist.

108.    Plaintiff has still not recovered from this diagnosis and continues to suffer from depression and anxiety.

109. In addition, although Plaintiff graduated from the School in May 2021, and was previously accepted to APSU, Plaintiff was unable to attend in part due to the loss of his eligibility for scholarships and in part due to his continuing depression.

110. Plaintiff was also terminated from his job at Old Man Lead, a hunting and fishing store located in Stewart County, Tennessee, despite having an exemplary employee record.

111. On information and belief, Plaintiff was terminated due to the rumors circulating in the community concerning the allegations against him.

## COUNT I

### VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS (against all Defendants)

### (42 U.S.C. § 1983)

112. Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

113. As a citizen of Tennessee, Plaintiff had the right to a free public education, which constitutes a property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

114. Plaintiff also possessed a liberty interest in his reputation protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

115. Therefore, Plaintiff could not be deprived of educational benefits or his reputation by an educational institution without due process of law.

116. The Final Rule, which was enacted to provide due process protections to safeguard the property and liberty interests of students, provided the constitutionally mandated due process procedures that the School was required to follow if it sought to deprive Plaintiff

of his protected property and liberty interests as a result of a sexual harassment complaint from a fellow student.

117.    Even though each individual Defendant knew that the allegation against Plaintiff constituted a Title IX complaint, each individual Defendant failed to follow the due process procedures mandated by the Final Rule both when investigating the sexual harassment complaint against Plaintiff and subsequently meting out discipline against Plaintiff.

118.    As a result, each individual Defendant deprived Plaintiff of his constitutionally protected property and liberty interests without due process of law, and each individual Defendant is liable for such deprivation.

119.    Defendant Gray violated Plaintiff's constitutional rights by failing to provide him with adequate notice of the allegation against him, conducting a non-compliant investigation, prosecuting a fundamentally flawed disciplinary hearing against Plaintiff without providing Plaintiff the opportunity to view or confront the witnesses and evidence against him, and arbitrarily issuing disciplinary sanctions against Plaintiff in the absence of a grievance process that comported with due process.

120.    Defendant Duncan violated Plaintiff's constitutional rights by arbitrarily issuing disciplinary sanctions against Plaintiff in the absence of a grievance process that comported with due process.

121.    Defendants Saunders, Gillum, and Page violated Plaintiff's constitutional rights by conducting a fundamentally flawed disciplinary hearing against Plaintiff without providing Plaintiff the opportunity to view or confront the witnesses and evidence against him and affirming the validity of both Defendant Gray's non-compliant investigation and the arbitrary disciplinary sanction against Plaintiff.

122. Defendant Watson violated Plaintiff's constitutional rights through her deliberate indifference to the violation of Plaintiff's due process rights that she knew was occurring, but failed to intervene to stop, and by arbitrarily issuing disciplinary sanctions against Plaintiff in the absence of a grievance process that comported with due process.

123. As demonstrated by the myriad failures of the individual Defendants to observe even the basic requirements of due process guaranteed by the United States Constitution and the Final Rule, it is obvious that SCSS inadequately trained its staff in how to handle Title IX complaints.

124. Public school administrators are educators, not lawyers, and the due process requirements set out by the Final Rule are complicated and steeped in legal concepts unfamiliar to those without a background in law.

125. Indeed, the Final Rule itself requires that school officials who participate in Title IX investigations be trained in its various strictures.

126. It is thus obvious that inadequately training school administrators in the due process requirements of Title IX complaints would lead to violations of students' constitutional rights.

127. Therefore, Defendant SCSS is also liable for the deprivation of Plaintiff's constitutional rights because it failed to adequately train its employees in the proper procedures for handling Title IX sexual harassment complaints.

128. Plaintiff suffered actual damages in the form of lost scholarship money, extreme emotional distress, and irreparable harm to his reputation as a result of the Defendants' deprivations of his rights.

19

## COUNT II

## VIOLATION OF § 504 OF THE REHABILITATION ACT (against SCSS)

## (29 U.S.C. § 794)

129.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

130.     Defendant SCSS receives federal assistance in the form of federal education spending.

131.     As a recipient of federal assistance, SCSS is prohibited from discriminating against those with qualifying disabilities by § 504 of the Rehabilitation Act.

132.     To prevent discrimination against disabled students in the disciplinary context, U.S. Department of Education regulations implementing § 504 require that a school conduct a "manifestation determination" to consider if a disabled student's code of conduct violation was caused by, or had a direct and substantial relationship to, the student's disability before implementing discipline that constitutes a change in that student's placement.

133.     Plaintiff has multiple qualifying disabilities under § 504.

134.     Defendant SCSS knew that Plaintiff has multiple qualifying disabilities.

135.     Placing a student in ALC constitutes a change in placement.

136.     Permanently removing a student from a scheduled class constitutes a change in placement.

137.     Despite the fact that it knew about his qualifying disabilities, Defendant SCSS never conducted a manifestation determination to consider whether Plaintiff's disabilities caused or had a direct and substantial relationship to his alleged code of conduct violations before placing Plaintiff in ALC or moving Plaintiff from his Nutrition class.

138.    Therefore, SCSS has discriminated against Plaintiff on the basis of his disabilities, and is liable for such discrimination.

139.    Pursuant to the Rehabilitation Act, Plaintiff may sue Defendant SCSS for its discrimination without exhausting his administrative remedies because 1) neither Plaintiff nor his mother were informed of the school's § 504 grievance resolution process at the time the discrimination occurred or any time thereafter; 2) exhausting administrative remedies would be futile because Plaintiff has since graduated; and 3) Plaintiff is seeking compensatory damages for violations of his rights, which is not a remedy available in administrative proceedings.

**COUNT III**

**NEGLIGENCE (against Defendants Gray and Duncan)**

140.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

141.    Defendants Gray and Duncan had a duty to keep confidential the information regarding the sexual harassment complaint against Plaintiff.

142.    Defendants Gray and Duncan breached that duty by allowing subordinate employees to publicly reveal that confidential information to the public and by failing to instruct the complainant to keep her accusations confidential.

143.    As a result of Defendants' breaches, Plaintiff suffered damage to his reputation and extreme emotional distress.

144.    Plaintiff's injuries were proximately caused by Defendants' breaches of their duties, as it was reasonably foreseeable that Plaintiff's reputation would be damaged and Plaintiff would suffer extreme emotional distress as a result of their failure to safeguard the

confidential nature of the allegation against Plaintiff.

145.     The avoidance of this very outcome is the reason the safeguards were instituted.

146.     Therefore, Defendants Gray and Duncan are liable to Plaintiff for their negligence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Xavier Torres respectfully requests that this Court grant him:

A.     An award of compensatory damages, in an amount to be proved at trial;

B.     An award of $500,000 in noneconomic damages as a result of his pain and suffering and mental anguish;

C.     An award of $750,000 in punitive damages for the individual Defendants' callous disregard of his federally protected rights;

D.     An award of reasonable attorneys' fees and costs; and

E.     Any other relief that this Court deems just and proper.

Dated: December 8, 2021

*/s/ David J. Goldman*
David J. Goldman (TN BPR# 035151)
Seamus T. Kelly (TN BPR# 032202)
MUSIC CITY LAW, PLLC
1033 Demonbreun St., Ste. 300
Nashville, TN 37203
(615) 200-0682
seamus@musiccityfirm.com
david@musiccityfirm.com